IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

Dushawn Sellers,               :

        Plaintiff,             :

     v.                        :    Case No. 2:12-cv-0005

University of Rio Grande,      :    JUDGE EDMUND A. SARGUS, JR.
                                    Magistrate Judge Kemp
        Defendant.             :


OPINION AND ORDER

On January 4, 2012, Plaintiff Dushawn Sellers filed this
action against the university she currently attends, Rio Grande
University, claiming a violation of the Americans with
Disabilities Act.  In particular, she asserted that her
dismissal, or impending dismissal, from the University's nursing
program resulted from the University's failure to provide her
with proper accommodations for her disabilities.

Two days later, The Honorable Edmund A. Sargus, Jr., the
District Judge assigned to this case, issued a temporary
restraining order under which Ms. Sellers could enroll in nursing
courses for the current semester, although the University could
choose not to allow her to participate in any direct patient care
when on clinical rotation.  That TRO expired by its terms on
January 17, 2012, the day on which a further TRO hearing was
scheduled.  The parties consented to the Magistrate Judge's
conducting that hearing and making a final ruling on the question
of whether the TRO should be extended.

The hearing was held as scheduled.  Seven witnesses
testified, and both parties introduced exhibits.  At the end of
the hearing, and after counsel argued the issue, the Court
extended the TRO to the close of business on Friday, January 20,
2012, to give the Court time to decide whether any further
extension might be justified.  For the following reasons, the

Court extends the TRO to January 31, 2012.

I.

The legal test for issuing a temporary restraining order is well-known. The decision-making process involves balancing four factors – whether the plaintiff will suffer irreparable injury if relief is not granted, whether the plaintiff has shown a strong or substantial likelihood of success on the merits, and how the grant or denial of relief would affect both public and private interests. See, e.g., Workman v. Bredesen, 486 F.3d 896, 905 (6th Cir. 2007)(describing the factors as "(1) whether the claimant has demonstrated a strong likelihood of success on the merits, (2) whether the claimant will suffer irreparable injury in the absence of a stay, (3) whether granting the stay will cause substantial harm to others, and (4) whether the public interest is best served by granting the stay").

"No single factor will be determinative as to the appropriateness of equitable relief ...." Six Clinics Holding Corp., II v. Cafcomp Systems, Inc., 119 F.3d 393, 400 (6th Cir. 1997), citing In re DeLorean Motor Co., 755 F.2d 1223, 1229 (6th Cir. 1985). Rather, these factors are to be balanced, and "[a] finding that the movant has not established a strong probability of success on the merits will not preclude a court from exercising its discretion to issue a preliminary injunction if the movant has, at a minimum, 'show[n] serious questions going to the merits and irreparable harm which decidedly outweighs any potential harm to the defendant if the injunction is issued.'" Gaston Drugs, Inc. v. Metropolitan Life Ins. Co., 823 F.2d 984, 988 n. 2 (6th Cir.1987) (quoting Friendship Materials, Inc. v. Michigan Brick, Inc., 679 F.2d 100, 105 (6th Cir.1982)); see also Frisch's Restaurants v. Elby's Big Boy, 670 F.2d 642, 651 (6th Cir. 1982). Nevertheless, "irreparable injury is generally required to warrant injunctive relief," Kendall Holdings, Ltd. v.

-2-

Eden Cryogenics LLC, 630 F.Supp. 2d 853, 866 (S.D. Ohio 2008), so
that if the injury which the plaintiff seeks to prevent is
compensable by a monetary damages award, there is usually no
basis upon which to grant any type of injunction, no matter how
strong a showing of likelihood of success on the merits is made.

                                II.

    There was a good deal of testimony given at the hearing.
The Court summarizes the testimony here, and will comment
afterward on some of the credibility issues which surfaced.  It
is important to note that, at this stage of the case, the Court
does not necessarily have to resolve the conflicts, but rather
must factor into its analysis the possibility that the ultimate
trier of fact could choose to credit at least two different
versions of the facts.

    Ms. Sellers' version of the facts, supported primarily by
her own testimony, is as follows.  As background to the current
dispute, Ms. Sellers testified that she has been employed by the
Veterans' Administration as a licensed practical nurse.  However,
the VA decided to phase out its LPN positions and to employ only
registered nurses at the facility where Ms. Sellers worked.  In
order to keep her job, she decided to enroll in an RN program.
No slots were available in any of the programs near her home and
workplace in Cincinnati.  Therefore, she enrolled in the RN
program at Rio Grande University.  She signed a contract with the
VA which enabled her to obtain scholarship assistance, but also
obligated her to pay back some sum of money if she did not
successfully complete her program of study.  The contract
(Exhibit P1) appears also to require that Ms. Sellers complete
her studies within three years.  She signed the contract on
October 21, 2010, and the VA signed it on December 8, 2010.

    Ms. Sellers was originally an on-line student.  She suffers
from certain medical and psychological conditions, which she

                               -3-

described as epilepsy, attention deficit hyperactivity disorder (ADHD), anxiety, and depression. After successfully completing a number of courses, including some where she got in-person assistance from the instructor, she determined that she would be more likely to complete the degree program if she were an on-campus student. She successfully petitioned the University for permission to switch to being an on-campus student and began classes on campus in the summer of 2011. Rio Grande University is located more than 100 miles from Cincinnati, so she rented an apartment near campus, leaving her two minor sons in Cincinnati with their father.

Prior to the Fall, 2011 semester, Ms. Sellers had obtained help from professors informally, but had never declared her disabilities to the university in an official way. One of her courses in the Fall semester was Nursing V, team-taught by Professors Seagraves and McDonald. Professor Seagraves taught the first portion of the course, which included units on cardiology, neurology, and the respiratory system. Ms. Sellers immediately began to have difficulty with this course, and, according to her testimony, went to Professor Seagraves for assistance. Professor Seagraves told her that she could not offer her any help or accommodations unless she obtained a certification of her need for such services from the University's accessibility office. Ms. Sellers obtained copies of her medical records and, on September 8, 2011, the accessibility office issued her an Individual Accommodation Plan, or IAP. A copy of that plan was introduced as Exhibit P3. It entitled her to the following accommodation in each of her courses, including Nursing V: tutoring, drinks in the classroom, use of a tape recorder, extended test time (150%), least distractive environment, and an accommodation phrased as "may benefit from a note taker."

The first test in Nursing V was administered on September 9,

-4-

2011.  Ms. Sellers did not verbally inform Professor Seagraves about her IAP, nor did she ask for any accommodations on the test.  She did take copies of the IAP to the faculty office the prior evening and handed a copy personally to at least one of her instructors.  Neither Professor Seagraves nor Professor McDonald were present in the office.  Ms. Sellers gave copies of the IAP to Kathy Jones, the faculty secretary, who placed a single copy in Professor McDonald's mailbox.  Ms. Sellers believed, and testified that Ms. Jones also believed, that the two professors for Nursing V shared a mailbox, but Professor Seagraves testified that she had her own mailbox and never got a copy of Ms. Sellers' IAP.  It appears undisputed that Professor Seagraves did not see or know of the IAP before the test was administered.

The next unit which Professor Seagraves taught was on the neurological system.  Ms. Sellers testified that, although she had trouble from the beginning of the course with Professor Seagraves' teaching methods, she was able to do well in this section of the course by calling on a combination of her own experience and assistance from colleagues at the VA hospital. She passed the test on this unit, but when the cardiac unit began, the same problems she had with the first part of the course resurfaced.

By October 6, 2011, things had apparently reached crisis proportions. Struggling with her course material, she asked one of her former instructors (and her faculty advisor), Kim Stevens, for help.  While expressing a desire to help Ms. Sellers, Professor Stevens recommended that Ms. Sellers seek assistance from the faculty members teaching the course, because they would be more familiar with the way the subject was being taught and the content they were teaching.  Professor Stevens called the Dean of the College of Health and Behavioral Sciences, Donna Mitchell, to discuss the situation, and Dean Mitchell concurred

-5-

in her assessment.  Dean Mitchell then spoke with Ms. Sellers by telephone and told her that Professor Seagraves would be her tutor for Nursing V, encouraging her to call Professor Seagraves to arrange tutoring sessions.  According to both Dean Mitchell and Professor Seagraves, this was the first time either of them learned that Ms. Sellers had been given an IAP that entitled her to tutoring assistance.

It was not the first time, however, that Ms. Sellers met with Professor Seagraves to ask for help.  According to documents entitled "Special Progress/At Risk Form" (Exhibit D-4) which Professor Seagraves completed, as early as September 9, 2011, the day that Ms. Sellers failed the first test, she advised Ms. Sellers to focus on certain areas where she had shown weakness on the test, and recommended that she study with a partner. Although claiming not to have known that Ms. Sellers had been granted accommodations by the Accessibility Office, on September 23, 2011, Professor Seagraves spoke to Ms. Sellers and to Brenda Mershon, a student performing well in the course, asking that they study together, and suggested to Ms. Mershon that she contact the Accessibility Office to see if she could get paid for providing assistance to Ms. Sellers.  She also labeled the form she completed that day as a "tutoring note."  The two students met once, briefly, and then concluded that their schedules were not ideally suited for further meetings.  Ms. Sellers met with Professor Seagraves again on September 30, 2011, at which time she was encouraged to continue working with a study group and to bring specific problems to Professor Seagraves.

After Dean Mitchell got involved in the situation, Professor Seagraves (at least according to her notes) met with Ms. Sellers on October 7, 2011 for a one-hour tutoring session.  She claims to have gone over many items that would be on the cardiac test; however, Ms. Sellers disputed that any real tutoring occurred.

-6-

One of the problems Ms. Sellers testified to was that because she was having a particular problem understanding the way in which Professor Seagraves was presenting the material in class, having the same person as a tutor was not helpful.  She also testified that Professor Seagraves was hostile to her, having commented, for example, at a later time that a tutor could not take Ms. Sellers' tests for her, and that in response to hostility, she becomes anxious and distracted.  Two "tutoring notes" were made on October 19, 2011, indicating that Professor Seagraves, Ms. Sellers, and Dean Mitchell met that day; that Ms. Sellers was told she should schedule a standing tutoring appointment with Professor McDonald for the balance of the term because Professor McDonald would be teaching the remainder of the course; and that Professor Seagraves provided more tutoring on subjects related to the cardiac exam.  One of these notes also referred to Ms. Sellers' "ICP" and the requirement that the University provide her with tutoring services although, again, Professor Seagraves denied ever having seen the plan and said she never asked Ms. Sellers what her approved accommodations were.

Ms. Sellers took the cardiac exam on October 21, 2011.  She used the testing accommodations granted in her IAP.  She failed the test.

Shortly after the test grades were posted, Ms. Sellers had an emotional confrontation with Professor Seagraves that afternoon.  The theme of Ms. Sellers' comments were that she had been promised tutoring services but that they had not been provided.  Professor Seagraves responded that she had set Ms. Sellers up with different students to act as tutors and that she herself had provided tutoring help, and was not sure what more Ms. Sellers expected her to do.  After the confrontation, during which Ms. Sellers was described as "hysterical," Professor Seagraves called campus police and alerted them to the situation,

-7-

stating that although Ms. Sellers had not threatened her, she felt threatened by what had occurred.

The next month passed without apparent incident. However, as the date for the final examination in Nursing V approached, Ms. Sellers again sought tutoring help because the final test included sections on the two units she had failed. Shortly before the examination, the University hired a tutor for her. They met on three occasions, only one of which was a significant tutoring session. According to Ms. Sellers, the University had not provided the tutor with any course materials prior to the first meeting. Ms. Sellers took the final examination on December 7, 2011, again with accommodations (extended test time and in the testing center). There was a significant conflict in the testimony about whether the testing environment for that test was unduly distracting, and even a disagreement about where Ms. Sellers sat when she took the test. Ms. Sellers failed both the test and the course, earning a 75% in a course where a 78% was needed to pass. Because passing Nursing V is a prerequisite to enrolling in Nursing VI, but for the Court's TRO, Ms. Sellers would not be enrolled in that course.

In an email dated December 7, 2011, Dean Mitchell offered Ms. Sellers the option of reapplying to the nursing program in the Fall of 2012. She suggested that Ms. Sellers complete her general educational requirements (which she apparently is entitled to do) and take a readmission examination. If she passed the examination and otherwise complied with the readmission policy, she could retake any courses she failed in the following semesters. Dean Mitchell offered to write to the VA explaining what had happened and encouraging that agency to continue to provide scholarship assistance to Ms. Sellers. As of the date of the hearing, Ms. Sellers had not contacted the VA to determine if that would be possible. She testified that if she

-8-

did not complete her education by August of 2012, she would not have a job to go back to, and would have to pay damages to the VA under her education contract.

III.

The first factor to be evaluated is whether Ms. Sellers has shown a strong or substantial likelihood of success on the merits, or, alternatively, whether there is a serious question going to the merits.  The University argues that Ms. Sellers has no chance of succeeding on the merits of her claim under the Americans with Disabilities Act because her primary argument - that Rio Grande violated that Act by failing to provide her with adequate tutoring services - is completely foreclosed by cases which persuasively interpret the Act not to require such services for post-secondary students.  Although this Court agrees that there is strong authority for the proposition that a post-secondary institution generally has no obligation to provide tutoring as an accommodation to persons with disabilities, under the particular facts of this case, Ms. Sellers has demonstrated at least a serious argument that the University both had and breached such an obligation here.

The Rehabilitation Act of 1973 was designed to protect disabled persons from discrimination in the provision of public services.  It provides that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . "  29 U.S.C. § 794.  Similarly, under Title II of the Americans with Disabilities Act (ADA) "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public

entity, or be subjected to discrimination by any such entity."
42 U.S.C. §12132. Taken together, these statutes provide a broad
range of protection for individuals with disabilities, with the
goal of making public services or accommodations equally
accessible to them as to persons who do not labor under a
legally-recognized disability.

The Office for Civil Rights (OCR) is the enforcement agency
within the United States Department of Education charged with
ensuring that educational institutions receiving federal
assistance do not engage in discrimination. See 20 U.S.C. §3413;
34 C.F.R. §104.1. OCR enforces Section 504 of the Rehabilitation
Act through regulations found in 34 C.F.R. part 104, and it is
also charged with enforcing Title II of the Americans with
Disabilities Act in education systems and institutions. See 28
C.F.R. §35.190(a)(2).

One of the regulations pertinent to this case is 34 C.F.R.
§104.44(d). That regulation applies to "recipients" of federal
funds, and it appears that the University is such a recipient
because of its receipt of federally-provided scholarship money
(and perhaps for other reasons as well). See 34 C.F.R.
§104.3(f). 34 C.F.R. §104.44(d) states, in pertinent part, that
"[r]ecipients need not provide attendants, individually
prescribed devices, readers for personal use or study, or other
devices or services of a personal nature." Although it is not
immediately apparent from the language of this regulation, both
the OCR and a number of judicial decisions have concluded that it
relieves a post-secondary institution from the obligation to
provide tutors to students with disabilities.

Turning first to agency interpretations, the two decisions
attached to the University's memorandum in opposition to Ms.
Sellers' motion for a temporary restraining order generally
support the University's position about tutorial services. In

-10-

Central Mich. Univ., 18 NDLR ¶ 242 (OCR Region XV 2000) (attached
to Defendant's Motion as Exhibit D), the OCR found it was not a
violation of the Rehabilitation Act to discontinue providing a
disabled student with tutoring services after the university, in
the mistaken belief that it had to provide such services, had
provided them and then discontinued them.  The decision recited
that the OCR had previously construed this regulation "to exclude
the provision of tutorial services as an auxiliary aid."  And in
Hastings College of Law, 4 NDLR (LRP) ¶ 226, 1993 NDLR (LRP)
LEXIS 1168 (OCR Region IX 1993) (attached to Defendant's Motion
as Exhibit E), the OCR did not find the College in violation of
Section 504 and Title II for failing to provide the complainant
with the services of a learning disability specialist, even
though he had been provided with one during his first year of
school.  These formal adjudications from the OCR are entitled to
substantial deference.  See St. Francis Health Care Ctr. v.
Shalala, 205 F.3d 937, 943 (6th Cir. 2000) (noting that courts
are to give substantial deference to an agency's interpretation
of its own regulations and that if it is a reasonable regulatory
interpretation a court must defer to it); see also Christensen v.
Harris County, 529 U.S. 576, 587 (2000) (noting Chevron-style
deference applies to formal adjudications); Claiborne-Hughes
Health Ctr. v. Sebelius, 609 F.3d 839, 844 (6th Cir. 2010).

But that is not necessarily the end of the regulatory
inquiry.  The same set of regulations contain a provision stating
that "a recipient, in providing aid, benefit, or service, may not
. . . on the basis of handicap afford a qualified handicapped
person an opportunity to participate in or benefit from the aid,
benefit, or services that is not equal to that afforded to
others."  34 C.F.R. §104.4 (b)(ii).  In Hood College, 12 NDLR
(LRP) 127, 1997 NDLR (LRP) LEXIS 755 (OCR Region III 1997)
(attached to Defendant's Motion as Exhibit F), the College

-11-

identified a list of accommodations that it determined might be appropriate for the student, including tutoring, but tutoring was not ultimately offered. The OCR found that although the student could benefit from tutoring, the College had no obligation under the regulations to provide the student with a tutor, except to the same extent that it provided it for students without disabilities. Similarly, in Rancho Santiago Community College, 3 NDLR (LRP) 52, 1992 NDLR (LRP) LEXIS (OCR Region IX 1992) (attached to Defendant's Motion as Exhibit G), in response to a student's claim that tutoring services were denied to her, the OCR found that the student received the same notice of availability as other students, citing 34 C.F.R. §104.4, and there was no evidence that the student had been denied tutoring services on the basis of disability - implying that the denial of such services on that basis would have been a violation because tutoring was generally available to other students. The OCR has also published a pamphlet titled "Transition of Students with Disabilities to Postsecondary Education: A Guide for High School Educators," March 2011 (attached to Defendant's Response as Exhibit C). It states that a postsecondary school is not required to provide tutoring, but also instructs that if tutoring is offered to the general student population, the school must ensure the tutoring services are available to students with disabilities as well. Although this pamphlet is not entitled to Chevron-style deference, it is "entitled to respect" to the extent it has the "power to persuade." Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944); see also Christensen v. Harris County, 529 U.S. 576, 587 (2000).

In addition to these agency interpretations, there is, of course, case law. In Bevington v. Wright State University, 23 Fed. Appx. 444 (6th Cir. 2001), the Court of Appeals, citing 34 C.F.R. §104.44(d), held that a tutorial program is not a required

-12-

accommodation for a disabled student in a post-secondary school under the Rehabilitation Act regulations. Similarly, a district court in Wisconsin recently held that 34 C.F.R. §104.44(d)(2) does not require that a tutor be provided as a reasonable accommodation. <u>Carlson v. Carroll University</u>, 2011 WL 5921445 (E.D. Wis. Nov. 28, 2011). Neither of these decisions, however, involved a situation where the general student population was provided tutorial services but the same opportunity was denied to students with disabilities.

Here, there is a substantial argument to be made that the University was required under 34 C.F.R. §104.4(b)(ii) to provide tutoring to its disabled students to the same extent it offered such services to its general student population. Dean Donna Mitchell testified that providing tutoring services to students, whether or not they have disabilities, is a University-wide policy. Thus, it will not do simply to say that the University had no such obligation to Ms. Sellers, and that she cannot premise an ADA claim on the failure to provide these services to her. At a minimum, there are serious legal issues raised by her ADA claim.

The University also argued, however, that it met any obligation it had because it provided Ms. Sellers with a variety of tutoring services, including tutoring by the two professors who taught Nursing V and by a variety of students. This is a fact-based argument, however, and it is important to recognize that this case is in its very early stages, when factual development is usually in its infancy. If there were no dispute, and no possibility of one, about the extent and adequacy of these efforts, the Court might be in a position to make factual determinations now, and base its decision on those determinations - but that is clearly not the case. There were sharp disagreements among the witnesses about whether the meetings

between Ms. Sellers and Professor Seagraves involved any tutoring at all; about whether it was clear that directing Ms. Sellers into group study sessions was not the equivalent of tutoring given her acknowledged disabilities; about whether the communication and personality difficulties existing between Ms. Sellers and Professor Seagraves prevented the two from communicating effectively in a tutoring session; and about other matters which ultimately will answer the factual question of exactly what Ms. Sellers was given and how it squared with the obligation that the University owed to her (should she succeed in proving that, indeed, an obligation was owed). It suffices to say at this point that there are good reasons to both respect, and suspect, the credibility of the various witnesses about these matters; most had a substantial stake in the outcome of the case, and there were a number of inconsistencies between testimony and documents, or certain testimony that was inherently incredible, all suggesting that a jury or judge will need a more completely developed record to sort out which party's version of the facts will eventually turn out to be the more believable. When the record is in this state, it is appropriate to recognize that the plaintiff may well be able to prove the facts which support her claim, and disprove the ones which detract from it, and it is fair to conclude that the claim has a serious factual basis underlying it, even if the definitive trier of fact ultimately finds that factual basis to be unproven or incorrect. In the end, the presence of both difficult and serious legal and factual questions provides the underpinnings for the Court's analysis of this first of the four relevant factors. The weight given this factor will be more fully discussed in Section VI below.

IV.

The Court turns next to the question of irreparable injury. Ms. Sellers has identified a number of potentially disastrous

-14-

consequences which would flow from her not being permitted to complete her nursing education at Rio Grande, including putting her in breach of her contract with the VA, being subject to damages for breaching that contract, and not being able to return to her job at the Cincinnati VA hospital. All of these consequences would affect her financial well-being, of course, but if it turned out that the University had wrongly denied her the chance to complete her education, the Court could remedy that wrong by means of a permanent injunction issued at the conclusion of the case and by awarding her money damages. The damages she would incur from breaching her contract with the VA would be fairly readily calculable; the financial impact caused by the loss of her job and a delay in being able to pursue other job opportunities would be less easily computed, but judges and juries often are asked to award damages based on the impact that a civil wrong has on a plaintiff's employment status or future employment prospects.

In response to the Court's questions about this issue during closing argument, Ms. Sellers' counsel stated that there were a variety of intangible injuries which she would suffer from this loss of educational opportunities, such as increased time away from her family and the inability to pursue her vocation, and she might sustain additional psychological damage. The Court will consider how these various types of injuries relate to the "irreparable injury" factor which must be evaluated and balanced here.

There is some authority for the proposition that an interruption in an educational program is not, of itself, an irreparable injury. See, e.g. Baer v. National Bd. of Medical Examiners, 392 F.Supp. 2d 42, 49 (D. Mass. 2005) (stating, in the context of a medical student's ADA claim, that "her inability to continue as a medical student without interruption at Drexel,

-15-

while desirable, is not a harm that is irreparable to Baer's potential medical career"). There is contrary case law, however, especially when the denial of an educational opportunity is coupled with other types of harm. Thus, the court in Maczaczyj v. State of N.Y., 956 F.Supp. 403, 408 (W.D.N.Y. 1997) found the evidence of irreparable harm caused by the refusal of a university to permit a disabled student to pursue a graduate degree to be sufficient to support a preliminary injunction where the exclusion "would most likely affect the plaintiff's ability to engage in the future employment of his choice" and there was also an "unquantifiable effect th[e] exclusion will have on plaintiff's mental illness." Because the plaintiff was "likely to suffer additional psychic harm," the court found the injury to be irreparable. Other courts have similarly found even a delay in the ability to pursue a chosen profession to be the type of irreparable harm which will support temporary injunctive relief. See, e.g., Bonnette v. District of Columbia Court of Appeals, 796 F.suup. 2d 164, 186 (D.D.C. 2011) ("The lost opportunity to engage in one's preferred occupation goes beyond monetary deprivation"). And, although not determinative, there is some authority for the proposition that when Congress has enacted a statute such as the ADA to prohibit discrimination against individuals with disabilities, the occurrence of the very discrimination Congress sought to prevent is the type of irreparable injury that may support the issuance of an injunction. See, e.g., EEOC v. Chrysler Corp., 733 F.2d 1183, 1186 (6th Cir. 1984)(injuries from forced early retirement in violation of the ADEA such as loss of work, loss of future prospects for work, and infliction of emotional harm are both the type of injuries Congress sought to avoid through the ADEA and injuries which could constitute irreparable harm). Given the state of the law, Ms. Sellers has demonstrated that, if she is

-16-

forced to dis-enroll from her nursing education program now, she may well suffer injuries of a type that can neither be measured or compensated by a later award of money damages.  This factor weighs in favor of continuing the TRO.

V.

The next step in the TRO process is to identify any public or private interests which might be harmed or advanced by the grant or denial of relief.  Judge Sargus addressed some of these factors in his earlier Opinion and Order granting a TRO, finding that "[b]ecause the University can impose reasonable limitations on [Ms.] Sellers's treatment of patients, the issuance of the temporary restraining order will not cause others substantial harm.  In addition, the public interest in affording accommodations for disabilities, as written into the ADA, favors [Ms.] Sellers."  Opinion and Order of January 6, 2012, Doc. #4, at 4.  Those factors are no different here, because the TRO which the Court is considering extending provides the same option to the university to protect any patient's interest by limiting Ms. Sellers' direct interactions with them.  Additionally, the Court notes that many other courts agree with Judge Sargus that the ADA reflects the fact "that there is a significant public interest in eliminating discrimination against individuals with disabilities" and that this interest is furthered by appropriate injunctive relief.  See Thomas By and Through Thomas v. Davidson Academy, 846 F.Supp. 611, 620 (M.D. Tenn. 1994).

There is no evidence that the University will suffer any financial harm from a continuation of the TRO.  Presumably (and there is nothing in the record to the contrary), Ms. Sellers has paid the required tuition for the courses she is taking.  There could be some indirect harm to the University's nursing program from allowing a student who has not met the progression requirements of the program to continue to participate in it.

-17-

Some witnesses suggested, for example, that this could create a problem with the Ohio Board of Nursing, which requires strict compliance with the progression standard that a nursing program establishes.  However, the fact that the University has allowed Ms. Sellers to continue her nursing education to this point only pursuant to a Court order, and the fact that it might ultimately be required to allow her to continue because it violated the ADA, should counteract any claim that it has disregarded either its own or Ohio's nursing standards by continuing to provide nursing instruction to Ms. Sellers.  Other than patients, whose interests can be protected in the short term by restrictions on Ms. Sellers' participation in direct patient care, there do not appear to be any third parties whose interests might be affected by a continuation of the TRO.

The Court recognizes that, were the TRO to be converted to a preliminary injunction, there would be some tension between Ms. Sellers' continued inability to participate in clinical care and the likelihood that she would not receive credit for the Nursing VI course if she does not complete the clinical care requirements of the course more or less concurrently with the classroom requirements.  Should the Court ultimately find that a preliminary injunction is warranted, it will have to confront directly the question of whether the record supports a finding that a student who achieves a 75% grade in the Nursing V course, as opposed to one who achieves a 78% grade, presents a quantifiably greater risk to critically ill patients in the settings in which Rio Grande nursing students provide patient care, or whether Ms. Sellers herself presents such a risk.  That might well be a matter on which additional evidence could be taken, but it is not particularly relevant to the question of whether an eleven-day extension of this TRO would adversely affect such patient interests, and the Court need not confront it

-18-

now.

VI.

The last step in the analysis requires the Court to balance the competing factors and interests and to make an equitable judgment about the plaintiff's entitlement to the "extraordinary remedy," see Sternberg v. Checker Oil Co., 573 F.2d 921, 925 (6th Cir. 1978), which she seeks.  That balancing persuades the Court that an extension of the TRO is appropriate and justified.

The first factor, likelihood of success on the merits, does not weigh strongly in Ms. Sellers' favor, at least based on the present record.  Although she makes passing reference to some violations of accommodations granted to her other than tutoring, the University's failure to provide her with adequate tutoring is clearly the linchpin of her ADA claim.  The discussion of that aspect of the case in Section III of this Opinion and Order shows that she faces some fairly significant hurdles in succeeding on that claim, although the law is not as clear as the University claims that the failure to provide tutoring services can never support an ADA claim.  Here, given the University's policy of providing tutoring to all students, and its specific provision of that accommodation to Ms. Sellers, it might.  And there is certainly enough evidence in the record from which a trier of fact could conclude that the tutoring services which were provided were inadequate to meet Ms. Sellers' needs, and not just because she did not pass the course.  There is, at a minimum, credible (though contested) evidence that neither co-student tutoring, especially in large group settings, nor the meetings with Professor Seagraves, were effective responses to Ms. Sellers' particular disabilities, and that the University was or should have been aware of that fact at the time.

The second factor, irreparable injury, weighs substantially in Ms. Sellers' favor.  The disruption to her already-implemented

plan of obtaining an RN in order to keep her job with the VA, a plan that required her to leave her family at home and to expend considerable effort to complete the nursing program at Rio Grande, which would occur if the TRO is not continued, is evident.  If the Court were later to issue a preliminary injunction in her favor (again, not now an issue), the fact that the TRO would have expired, and she would have missed class time, might well render any such relief ineffective.  The Court has also described the other harms she might suffer, and agrees with the case authority holding that such injuries may well be irreparable.

The only other interest entitled to any weight, because it is the only other one that is implicated by a brief continuation of the TRO, is the public policy in favor of ADA enforcement. That policy may not be as strong where the evidence of a violation is fairly debatable, as it is here, but it is still a policy that favors relief.  No other public or private interests appear to be either positively or negatively affected.

Balancing these factors, the Court finds this to be a case where a short continuance of the existing TRO can prevent irreparable injury, arguably furthers public policy, and is supported by an adequate, although not overwhelming, showing of the potential for Ms. Sellers' claims to succeed.  Therefore, as an exercise of its discretion, the Court will continue the TRO.

VII.

Based on the findings and conclusions contained in this Opinion and Order, the temporary restraining order issued by this Court on January 6, 2012, is continued on exactly the same terms and conditions to and including January 31, 2012, a date fourteen days from the original expiration date of the order, as permitted by Fed.R.Civ.P. 65(b)(2).

/s/ Terence P. Kemp
United States Magistrate Judge